INTERNATIONAL SHOW CAR ASSOCIATION, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS & PUBLISHERS, and Broadcast Music, Inc., Defendants.

No. 92–CV–70786–DT.

United States District Court, E.D. Michigan, S.D.

Oct. 14, 1992.

Paul Green, Jon H. Kingsepp, Kelly A. Allen, and Deborah Schneider, Bloomfield Hills, Mich., for plaintiff.

Lee W. Brooks, Honigman, Miller, Schwartz & Cohn, Barbara L. Goldman, Dykema Gossett, Detroit, Mich., Michael E. Salzman, and Bernard Korman, New York City, for defendants.

## OPINION

DUGGAN, District Judge.

Currently before this Court are defendants ASCAP and BMI's Motions to Dismiss or, alternatively, to Transfer to the Southern District of New York.[1] For the following reasons, the defendants' Motion to Transfer to the Southern District of New York shall be granted.

### Facts

Plaintiff, International Show Car Association ("ISCA") has sued defendants, American Society of Composers, Authors and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI") under the federal antitrust laws for engaging in a combination and conspiracy in restraint of trade and monopolizing the market for certain music performance rights. (See Counts I and II of Plaintiff's Complaint). Plaintiff's complaint also includes related counts for tortious interference with contractual relationship and for a declaratory judgment, both of which are based on the circumstances giving rise to its antitrust claims.

Defendant ASCAP is a New York unincorporated association. Defendant BMI is a New York Corporation. BMI and ASCAP are engaged in the business of licensing non-dramatic performances of musical compositions which they control by arrangements with the composers of those works. They do so by selling blanket licenses, and permitting performances of all of the works in their respective repertories.

ISCA is a membership-type of Michigan non-profit corporation which acts as a sanctioning and regulatory body for the custom car show industry. ISCA is a direct purchaser of non-dramatic music performance rights under blanket licenses from ASCAP and BMI. The rights thus purchased permit the performance of ASCAP and BMI compositions at custom auto shows which are sanctioned by ISCA. The shows are produced by the sanction holders who are also ISCA's producer-members. These producer-members pay annual fees to ISCA in exchange for sanctioning. The sanctions grant to the producer-members a variety of rights. The producer-members own ISCA and control its policies and practices under its articles of incorporation and by-laws.

Commencing in 1968, ISCA purchased blanket licenses from BMI covering all ISCA sanctioned events for one year periods. Similarly, commencing in 1979, ISCA purchased blanket licenses from ASCAP for its sanctioned events, also for one year periods. These blanket licenses were continuously renewed and purchased each year following their original terms until the events described in ISCA's complaint in 1990–91, at which time BMI and ASCAP cancelled the agreements, effective June, 1991 by notice to ISCA. Thereafter, BMI and ASCAP sought to require ISCA to purchase new license agreements on terms and "at rates established by their illegal combination and conspiracy and monopolization." (Complaint, ¶ 28).

In 1990, ASCAP and BMI, together with "the Music Task Force," began negotiations to develop standard rates, terms and conditions for music licensing contracts for Meetings, Conventions, Trade Shows and Expositions. (Complaint, ¶ 21). Prior to 1991, ASCAP and BMI set their fees separately. However, after negotiations with the Music Task Force, defendants' "co-conspirators, the organizations and the Music Task Force" only offered licenses pursuant to and conforming with the agreements among the organizations and the Music Task Force. (Complaint, ¶ 27).

ASCAP and BMI have thus "refused to issue to ISCA blanket licenses which set rates or contain terms and conditions dif-

---

1. Defendant BMI has merely "incorporated" ASCAP's motion to transfer. They rely solely on the affidavits, exhibits, and arguments set forth by ASCAP in support of their motion to transfer.

ferent from the agreements among them and the Music Task Force. Since June, 1991, ASCAP and BMI have sought to require ISCA to accept new blanket licenses which impose and conform to the rates, terms, and conditions of the agreements with the Music Task Force." (Complaint, ¶¶ 32, 28). These new blanket agreements contain rate schedules which are vastly increased from the rates ISCA paid under the now-cancelled blanket licenses it had with ASCAP and BMI. "The new blanket licenses are attempts by both organizations to engage in wrongful price-fixing and monopolization of the market, to the substantial detriment of ISCA. As a result, ISCA initiated this action against ASCAP and BMI." (Plaintiff's brief in response to ISCA's motion to dismiss or transfer, at 4).

### Discussion

Title 28, U.S.C. § 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

To transfer an action under 28 U.S.C. § 1404(a)[2] the following criteria must be met: (1) the action could have been brought in the transferee district court; (2) a transfer serves the interest of justice; and (3) transfer is in the convenience of the witnesses and parties. *In re Crash Disaster at Detroit Metropolitan Airport*, 737 F.Supp. 391, 393 (E.D.Mich.1989).

The factors to be considered by the Court in ruling on a § 1404(a) motion are (1) the convenience of the parties; (2) the convenience of the witnesses; (3) the relative ease of access to sources of proof; (4) the availability of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems associated with trying the case most expeditiously and inexpensively; and (7) the interest of justice. *Hite v. Norwegian Caribbean Lines*, 551 F.Supp. 390 (E.D.Mich.1982).

In short, the Court may consider any factor that may make any eventual trial "easy, expeditious, and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *Helder v. Hitachi Power Tools, USA Ltd.*, 764 F.Supp. 93, 96 (E.D.Mich.1991). *Accord Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) wherein the Supreme Court discussed the purpose behind Section 1404 as follows:

Congress enacted § 1404(a) to permit change of venue between federal courts. Although the statute was drafted in accordance with the doctrine of *forum non conveniens* ... it was intended to be a revision rather than a codification of the common law. District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of *forum non conveniens....* The statute was designed as a "federal housekeeping measure," allowing easy change of venue within a unified federal system.

454 U.S. at 253, 102 S.Ct. at 264. Defendants argue that applying these criteria to the instant case leads to the conclusion that transfer is appropriate. For reasons to follow, this Court finds defendants' argument persuasive.

### A. The Action Could have been Brought in the Southern District of New York

Plaintiff has alleged violations of both Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and seeks relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 4 of the Clayton Act, 15 U.S.C. § 15. (Complaint, ¶ 8, 33, 39). Accordingly, the Southern District of New York has subject matter jurisdiction over the instant case under 28 U.S.C. § 1331.

Furthermore, venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) which provides:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by

---

**2.** 28 U.S.C. § 1404 applies to antitrust actions. *United States v. National City Lines, Inc.*, 337   U.S. 78, 69 S.Ct. 955, 93 L.Ed. 1226 (1949).

law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Both ASCAP's and BMI's main offices are in the Southern District of New York. Therefore, both ASCAP and BMI "reside" in the Southern District of New York and venue is proper. Furthermore, both AS-CAP and BMI are amenable to service of process in the Southern District of New York.

## B. *A Transfer is in the Convenience of the Witnesses and Parties*

The defendants have submitted the affidavit of Bernard Korman, General Counsel for ASCAP, in support of their motion to transfer. The following facts are taken from that affidavit. ASCAP is a voluntary, unincorporated membership association organized under the laws of the State of New York with its principal offices in New York City. (Korman Affidavit, ¶ 3). Almost all of the witnesses ASCAP will call in its defense reside in, or in close proximity to, the Southern District of New York. Production of ASCAP's witnesses—including officers and employees of both ASCAP and BMI—in this district will entail great expense and inconvenience. (Korman Affidavit, ¶ 34). "Production of witnesses in this District may, and I believe likely will, substantially disrupt important aspects of ASCAP's business routine. Much of AS-CAP's case will require documents and data created and maintained at ASCAP's New York offices. This will necessitate having available ASCAP personnel who are responsible for the supervision and conduct of ASCAP's routine business activities, including convention/exposition licensing. Obviously, a lengthy jury trial will require the ready availability of key witnesses. Trial in New York will allow ASCAP's em-

ployees to do their work while the case proceeds; trial in Michigan would not." (Korman Affidavit, ¶ 35).

Korman states that ASCAP plans to call the following witnesses at trial: L. Barry Knittel, ASCAP Director of Licensing (New York City); William R. Lee, ASCAP National Sales Manager (New York City); Bruce Hobart, ASCAP Detroit District Manager (Detroit); Robert Wieland, former ASCAP Division Manager (Chicago); Peter M. Boyle, ASCAP Chief Economist (New York City); Bennett M. Lincoff, ASCAP Senior Attorney (New York City); Thomas G. Annastas, Vice–President—General Licensing, BMI (New York City); Marvin Berenson, BMI's General Counsel (New York City). (Korman's Reply Affidavit, ¶ 7).

Korman states that "as far as I can tell, the only potential ISCA witnesses located in this District is its General Manager, Mr. Dominick. Obviously, the individual producer-members of the ISCA are scattered throughout the United States. And the non-party witnesses who must testify about the negotiations between ASCAP, the NAEM and the Music Licensing Task Force, all reside in other districts. These non-party witnesses include: Sheldon London, a Washington, D.C. attorney who is the NAEM's counsel; Don Walter, former Executive Director of the NAEM and a resident of Indianapolis; and Jonathan T. Howe, a Chicago attorney who was the Music Licensing Task Force's chief negotiator. With the sole exception of Mr. Dominick, all of the witnesses can be produced at least as conveniently in New York as in this District." (Korman Affidavit, ¶ 36).

ISCA has submitted the Affidavit of Hayne Dominick in support of their response to the motion to transfer. Dominick states only that "based on my knowledge of ISCA and its financial situation, I do not believe that ISCA can afford the expense of prosecuting this action in the Southern District of New York. All of the ISCA documents and records are located in Michigan, and the majority of the witnesses ISCA intends to call are located in Michigan. ISCA has done business with ASCAP

and BMI in the Eastern District of Michigan. Furthermore, I am informed that many witnesses in this action are located in cities other than New York." (Dominick Affidavit, ¶ 14). ISCA has failed to name the witnesses which will testify at trial. In fact, ISCA has not identified any witnesses who will testify. Furthermore, the statement that "many witnesses are located in cities other than New York" does not make Michigan the more convenient forum between the two states.

Plaintiff argues that its choice of forum should be accorded primary importance in deciding whether to transfer this action. Plaintiff relies on *Clark v. Yellow Freight System, Inc.*, 715 F.Supp. 1377 (E.D.Mich. 1989) wherein the court stated that "[u]nless the balance strongly favors the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* at 1380.

However, where, as here, the "class" is nationwide, the deference usually accorded to the plaintiff's choice of venue is less important than in the traditional transfer of venue cases. *Blake Construction Co. v. International Harvester Co.*, 521 F.Supp. 1268 (N.D.Ill.1981). Plaintiff is a Michigan corporation headquartered in Madison Heights, Michigan. According to the complaint, the ISCA "acts as a regulatory and sanctioning body for the custom car show industry" and its "producer members are engaged in the business of producing custom car shows throughout the United States under the sanctioning and regulatory auspices of" the ISCA. (Complaint, ¶ 18). Exhibit B, attached to the Korman Affidavit, is a copy of the ISCA's 1992 Schedule of Events, to which is attached a description of the organization and its activities. Among other things, the ISCA is described as having over 20,000 members and presenting annually "more than 150 shows worldwide."

An examination of Exhibit B reveals that the producer members appear to be located predominantly in the South, the Midwest, California, Arizona, and the East Coast. Some of the producers are located in New York. It is the ISCA's producer-members who "typically and historically utilize music as an background feature in their custom auto shows" (Complaint, ¶ 19). ISCA has sought and obtained blanket licenses from ASCAP and BMI "for and on behalf of Plaintiff's Producer Members" allegedly pursuant to a "contractual and/or a business relationship with its Producer Members." (*Id.* ¶ 20). Thus, it appears that ISCA's potential witnesses reside in many states throughout the country, including both Michigan and New York.

Furthermore, contrary to plaintiff's assertion that there is a higher standard for those seeking to transfer antitrust cases (ISCA's brief in response to ASCAP's motion to transfer at 9), plaintiff's choice of forum need not be given additional weight merely because plaintiff brings an antitrust claim against defendants.

> Notwithstanding the special venue provisions of the Clayton Act, 15 U.S.C.A. §§ 12, 22, a civil antitrust action may be transferred pursuant to 28 U.S.C.A. § 1404(a).... Thus, although the liberal venue provisions of the Clayton Act afford plaintiff a broad range of choice as to forum, the appropriateness of that choice must be measured by the standards of § 1404(a) which governs the transfer of an action properly brought.

*McGuire v. Singer Co.*, 441 F.Supp. 210, 213 (D.V.I.1977) (citations omitted).

Finally, defendants argue that their files and data with respect to their negotiations with representatives of the convention/exposition industry are located in the Southern District of New York. (Korman Affidavit, ¶ 31). Korman states that the "ISCA never participated in any industry-wide negotiations with ASCAP and, thus, has few, if any, documents to transport to trial." (Korman Affidavit, ¶ 32). ISCA has not rebutted this statement except with Dominick's statement that "all of the ISCA documents and records are located in Michigan ..." (Dominick Affidavit, ¶ 14). ISCA has failed to identify which documents, if any, will have to be transported to New York if the action is transferred.

In sum, the affidavits submitted by both parties regarding defendants' motions to transfer show that the balance tips in favor

of transferring this action to the Southern District of New York when the convenience of the witnesses and parties is considered.

C. *Transfer is In the Interest of Justice*

1. Effect of *United States v. ASCAP*

In support of the motion to transfer, Korman states:

> On the basis of the allegations in the complaint, the only connection between the subject matter of this action and this District is the fact that the ISCA is located here. In contrast, the same factual allegations and the principal relief sought by the ISCA are closely connected with litigation in the Southern District of New York. Apart from the continuing jurisdiction exercised by Judge Conner in the Southern District of New York over the 1950 Judgment, all prior ASCAP antitrust litigation involved issues similar to those raised by the ISCA. Judge Conner is fully familiar with the issues raised in the ISCA's complaint and with ASCAP's licensing activities.

(Korman Affidavit, ¶¶ 37, 38). For the following reasons, I find defendants' argument on this point a persuasive reason for transferring this action to New York. Due to the provisions contained in a 1950 consent judgment rendered in the Southern District of New York, it is "in the interest of justice" to transfer this action to that district.

> Plaintiff has alleged, in paragraph 32 of its Complaint:
>
> > Plaintiff has been forced to instruct its Producer Members to do without musical compositions in the ASCAP and BMI repertories because ASCAP and BMI are demanding unreasonably high rates and refusing or failing to negotiate with plaintiff for a blanket license ...

Thus, plaintiff is arguing that defendants are demanding unreasonable rates and refusing to negotiate with the plaintiff. These arguments are significant in that they both relate to issues over which the Southern District of New York has retained jurisdiction.

The following is an excerpt from *Broadcast Music, Inc. v. Columbia Broadcasting, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979)* in which the Supreme Court describes ASCAP's relationship with the Southern District of New York consent judgment issued in *United States v. ASCAP,* 1950–51 Trade Cas. (CCH) ¶ 62,595 (S.D.N.Y.1950) (attached as Exhibit A to Defendant ASCAP's Motion to Dismiss or to Transfer):

> The Department of Justice first investigated allegations of anticompetitive conduct by ASCAP over 50 years ago. A criminal complaint was filed in 1934, but the Government was granted a midtrial continuance and never returned to the courtroom. In separate complaints in 1941, the United States charged that the blanket license, which was then the only license offered by ASCAP and BMI, was an illegal restraint of trade and that arbitrary prices were being charged as the result of an illegal copyright pool. The Government sought to enjoin ASCAP's exclusive licensing powers and to require a different form of licensing by that organization. The case was settled by a consent decree that imposed tight restrictions on ASCAP's operations. Following complaints relating to the television industry, successful private litigation against ASCAP by movie theaters, and a Government challenge to ASCAP's arrangements with similar foreign organizations, the 1941 decree was reopened and extensively amended in 1950. *Under the amended decree, which still substantially controls the activities of ASCAP,* members may grant ASCAP only nonexclusive rights to license their works for public performance....
>
> \* \* \* \* \* \*
>
> ASCAP may not insist on the blanket license, and the fee for the per-program license, which is to be based on the revenues for the program on which ASCAP music is played, must offer the applicant a genuine economic choice between the per-program license and the more common blanket license. *If ASCAP and a putative licensee are unable to agree on a fee within 60 days, the applicant may apply to the district court [Southern*

*District of New York] for a determination of a reasonable fee, with ASCAP having the burden of proving reasonableness.*

The 1950 decree, as amended from time to time, continues in effect, and the blanket license continues to be the primary instrument through which ASCAP conducts its business under the decree.

\* · \* \* \* \* \*

[I]t cannot be ignored that the Federal Executive and· Judiciary have carefully scrutinized ASCAP and the challenged conduct, have imposed restrictions on various of ASCAP's practices, and, *by the terms of the decree, stand ready to provide further consideration, supervision, and perhaps invalidation of asserted anticompetitive practices.*

*BMI v. Columbia Broadcasting,* 441 U.S. at 11–12, 99 S.Ct. at 1558–59 (emphasis added).

Section IX of the 1950 Judgment provides a procedure by which any user who believes that the fee ASCAP seeks for a license is unreasonable may ask the United States District Court for the Southern District of New York to determine a reasonable license fee. Section IX also provides for a negotiating period and permits either the user or ASCAP to ask the court to fix an interim fee pending determination of a final fee for the license sought.

Aside from alleging violations of federal antitrust laws, the plaintiff in the case at bar complains both that the fees charged by ASCAP are unreasonable and that ASCAP failed to negotiate with plaintiff over the fees. Although plaintiff argues that it alleges only violations of antitrust laws, and therefore the New York Consent Judgment has no effect on the issues in the present lawsuit, a fair reading of plaintiff's complaint shows that plaintiff is dissatisfied with the "unreasonable fees" charged

by both ASCAP and BMI as well as ASCAP and BMI's failure to negotiate with plaintiff over the fee amount.

Courts have deferred to the Southern District of New York in cases regarding the level of fees charged by ASCAP as well as the negotiation process between ASCAP and its customers. In *Hulex Music v. Santy,* the district court gave its reasons for declining to resolve an ASCAP license fee issue:

> Resolution of [the ASCAP license fee] issue involves interpretation and application of the consent decree and amended final judgment issued in *United States v. ASCAP* ... In that decision, ASCAP licensing practices were comprehensively regulated, and the United States District Court for the Southern District of New York specifically retained jurisdiction to consider future challenges to such practices.... In view of that court's continuing jurisdiction, and considering that challenges to ASCAP's licensing practices will implicate provisions of the consent decree therein entered, allowing litigation of defendant's claims against ASCAP in this court would give rise to the possibility that ASCAP would be bound to follow two or more conflicting judgments.... Accordingly, this court declines jurisdiction in favor of the Southern District of New York.

698 F.Supp. 1024, 1029–30 (D.N.H.1988). *See also Dolfi Music, Inc. v. Forest Inn, Inc.,* 59 F.R.D. 5, 6 (E.D.Wis.1973);[3] *Bourne v. Hunter Country Club, Inc.,* 772 F.Supp. 1044, 1050 (N.D.Ill.1990).[4] These courts *dismissed* claims which are covered by the 1950 Consent Judgment. Rather than dismissing plaintiff's complaint, this Court believes that it is appropriate and "in the interest of justice" to simply transfer this case to the Southern District of New York.

Given the Second Circuit's and the Southern District of New York's intimate famil-

---

**3.** (Court rejected a counterclaim seeking to allege a conspiracy on the part of ASCAP and its members to violate Section 4 of the Clayton Antitrust Act and "the standards set forth in the amended consent judgment under which ASCAP has been operating").

**4.** (Court declined to rule on claims that ASCAP violated specific provisions of the 1950 Judgment, holding that the "provisions for resolving fee disputes between ASCAP and an applicant [found in ... the 1950 Amended Consent Decree] is an exclusive remedy afforded an unsatisfied licensed applicant").

iarity with antitrust litigation involving both ASCAP and BMI, it is in the interest of justice, and will promote uniform decision-making in this complex field, to transfer this case to the Southern District of New York.

2. *Court Dockets in the Southern District of New York and the Eastern District of Michigan*

The Southern District of ·New York's court docket is slightly less congested than that in the Eastern District of Michigan. The Southern District of New York had approximately 75 less actions per judgeship filed in the 12 month period ending June 30, 1991 than did the Eastern District of Michigan. (1991 Federal Court Management Statistics prepared by the Administrative Office of the United States Courts). In 1991, the median time for a civil case to go from filing to disposition in New York was seven months. In Michigan, the median time was eight months. Thus, it would not impose hardship on the court system to transfer this action to the Southern District of New York. In fact, a transfer would increase the efficiency of the federal court system as a whole.

For the reasons set forth above, this Court shall transfer this action to the Southern District of New York.